# Illinois Official Reports

## Appellate Court

---

### *In re Fatima A.*, 2015 IL App (1st) 133258

---

| | |
|---|---|
| Appellate Court Caption | *In re* FATIMA A., a Minor (Robert F. Harris, Cook County Public Guardian, Plaintiff-Appellant, v. The Department of Children and Family Services, an Administrative Agency in the State of Illinois; Bobbie Gregg, Acting Director of Children and Family Services; and Arthur Sutton, Administrative Law Judge in the Administrative Hearings Unit of the Department of Children and Family Services, Defendants-Appellees). |
| District & No. | First District, First Division<br>Docket No. 1-13-3258 |
| Filed | February 2, 2015 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's order affirming the decision of the Director of the Department of Children and Family Services upholding the denial of specialized foster care services for a minor was affirmed, notwithstanding the public guardian's contentions, *inter alia*, that the decision was legally erroneous in concluding that the minor was not eligible for specialized care because her needs were being met and that DCFS had met its burden of showing that the denial of specialized care was consistent with the minor's well-being, and that the decision was a denial of due process and arbitrary and capricious, since all of the relevant factors were considered and the decision to deny specialization was not clearly erroneous. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-31027; the Hon. Franklin Valderrama, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Jean M. Agathen, of counsel), for appellant.

Lisa Madigan, Attorney General, of Chicago (Carolyn E. Shapiro, Solicitor General, and Ann C. Maskaleris, Assistant Attorney General, of counsel), for appellees.

Panel

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Harris concurred in the judgment and opinion.

## OPINION

¶ 1      The plaintiff, Cook County public guardian, appeals on behalf of the minor, Fatima A. (Fatima), from the circuit court's order affirming a decision of defendant Erwin McEwen (Director),[1] the Director of defendant Department of Children and Family Services (DCFS) upholding the denial of specialized foster care services for the minor. Plaintiff alleges that: (1) the final administrative decision was against the manifest weight of the evidence because the decision found that all of the minor's needs were being met despite the fact that Fatima had severe eczema and had not yet seen a dermatologist; (2) the final administrative decision was legally erroneous where it concluded that the minor was not eligible for specialized care because her needs were being met; (3) the final administrative decision was clearly erroneous where it concluded that DCFS had met its burden of showing that the decision to deny specialized care was consistent with her well-being despite Fatima's severe medical and behavioral problems; and (4) the final administrative decision constituted a denial of due process and a violation of the Illinois Administrative Procedure Act (5 ILCS 100/1-1 *et seq.* (West 2012)), where it was arbitrary and capricious. For the following reasons, we affirm.

¶ 2                                           BACKGROUND
¶ 3      On October 18, 2010, DCFS's Child and Youth Investment Team (CAYIT) denied the request of Melanie B., Fatima's guardian, for specialized foster care services for the minor. Melanie B. appealed that finding.

¶ 4      On May 20, 2011, a hearing was held before an administrative law judge (ALJ) at the DCFS Administrative Hearings Unit. The ALJ first noted that Melanie B., as Fatima's guardian, had the burden of proof in this case, not DCFS. Melanie B.'s counsel preserved for appeal the issue of burden of proof, stating that it was counsel's belief that DCFS had the

---

[1]Pursuant to section 2-1008(d) of the Illinois Code of Civil Procedure (735 ILCS 5/2-1008(d) (West 2012)), we have amended the caption to correctly reflect the current department acting director. On our own motion, we hereby substitute her as a party as shown above.

burden of proof by a preponderance of the evidence to show that the action it took was in the best interest of the child.

¶ 5        Melanie B. testified first, stating that Fatima was placed in her home when she was 11 days old and was now 3 years old. When she was first placed in the home, Fatima had severe acid reflux and muscle rigidity on one side of her body due to drug exposure *in utero*. Fatima began physical therapy in May 2008 and was discharged a little over a year later. It was recommended that she continue exercises like swimming, which the minor could not do due to tubes in her ears. Melanie B. testified that Fatima was in gym classes and ballet classes at the time of the hearing. The gym classes were at a private facility because the facility disinfected the room before and after classes, whereas the park district facilities did not. Due to Fatima's allergies, this was necessary. Melanie B. testified that Fatima had both food and other allergies. Her food allergies were dairy (especially milk), soy, citrus, and eggs. The dairy allergy was both by ingestion and by touch. If Fatima touched milk, she "immediately welt[ed] up, start[ed] itching" and her eczema flared up. Ingesting it "close[d] her throat" and made her vomit. Soy caused upset stomachs, and citrus caused open sores in her mouth. Eggs caused Fatima's eczema to flare up.

¶ 6        Melanie B. testified that Fatima also had asthma and eczema. Her skin got very dry and scaly from her neck down. She had a prescription cream that Melanie B. put on her every night. She also had two topical creams. She kept a prescription medication for eczema at Fatima's school as well.

¶ 7        Melanie B. testified that Fatima's other allergies included dog dander, bug spray, and wool. Fatima's skin raised up wherever her eczema was when she touched dog dander, which would cause her to scratch the skin and bleed. Bug spray caused welts and throat closing. Wool caused "contact dermatitis."

¶ 8        Melanie B. further testified that Fatima was on prescription medicine for each different allergy. Melanie B. stated that she has hypoallergenic air purifiers in every room and a hypoallergenic vacuum at home. She also has special sheets, bedding, pillowcases, detergents, soaps, lotions, and wipes for Fatima. Melanie B. testified that she also has medication for her food allergies, besides an epinephrine pen (epi pen). Fatima is also on prescription eye drops for eye infections.

¶ 9        Melanie B. further testified that Fatima was in behavioral therapy at Illinois Masonic with Jennifer Bailey, which started January 5, 2011. Fatima was also in art therapy at school, which was recommended by her social worker at school after she refused to answer test questions during routine testing. At the time of the hearing, she did art therapy once a week. Melanie B. testified that Fatima's school social worker also recommended individual therapy and gave her a phone number at Illinois Masonic. Melanie B. testified that Fatima's pediatrician also agreed that therapy would benefit Fatima because her "tantruming" was becoming out of control. Melanie B. initiated the therapy because Fatima's home behavior was becoming erratic. She was "tantruming," crying for long hours at a time, shutting down in social situations, and becoming paranoid in public settings.

¶ 10       Melanie B. testified that Fatima was also becoming abusive toward her and her biological daughter. She testified that Fatima would "hit us, pinch, bite, kick." Melanie B. testified that Fatima saw Bailey at Illinois Masonic once a week. Bailey also did family therapy with Melanie B. and occasionally with her biological daughter. Melanie B. testified that she went to

an eight-week-long parenting class for children with disruptive behaviors and talked to Bailey about what she learned.

¶ 11    On cross-examination, Melanie B. testified that Fatima generally did not have acid reflux anymore and that the physical therapy for Fatima's muscle rigidity was terminated because it was successful. She testified that Fatima had never been to an allergist but that her doctor was going to refer her to one.

¶ 12    Melanie B. further testified on cross-examination that Fatima no longer has ear infections and that she passed her hearing tests after the tubes were put in her ears. Fatima is also no longer in need of a speech therapist. Melanie B. testified that the "tantruming" did not happen as often at school as it did at home.

¶ 13    Melanie B. further testified that Fatima's mother's rights were terminated in January 2011, and the goal was now adoption, regardless of whether Fatima was considered specialized or not. She testified that all the services she had described, including therapy, were covered by "the medical card," which Melanie B. did not have to pay for. She testified that the prescriptions were also paid for by the medical card. Melanie B. testified that Fatima's gym classes were covered by DCFS's monthly board check. She received $392 or $397 monthly for Fatima, plus $100 every month for gym classes.

¶ 14    Melanie B. testified that if Fatima was considered specialized and she received extra money, she would use the money for other classes and equipment she needs in the house that is not covered by the medical card. She also has to purchase bedding every three months for Fatima, as DCFS purchased the original bedding, but not the replacement bedding. DCFS also purchased the original air purifiers, but Melanie B. testified it would not purchase the replacements. Melanie B. also testified that she wanted a respite worker from DCFS because she could not leave Fatima with "just anyone."

¶ 15    Finally, Melanie B. testified that it was her belief that, after adoption, Fatima's behavioral therapy would be covered through the medical card.

¶ 16    It was then stipulated that if called to testify Jennifer Bailey would state that she is a behavioral clinician at Illinois Masonic. In her initial assessment of Fatima, she determined that Fatima needed weekly individual therapy as well as family therapy with Melanie B. She recommended that Melanie B. engage in a parenting group for parents of children with disruptive behavioral problems. Bailey would state that she is addressing issues with Fatima that include "violence towards others, tantruming, shutting down in social situations, suspicious or paranoid behavior such as thinking that everyone is watching or laughing at the minor, and obsessive compulsive disorder behaviors." Bailey would further testify that Fatima "is making very little progress in identifying triggering behaviors."

¶ 17    DCFS then put on its case, calling Dr. Lia Knox, a CAYIT reviewer, as its first witness. Dr. Knox testified that she had a Ph.D. in psychology. She was present at the CAYIT staffing that occurred on October 18, 2010, in regard to Fatima. The purpose of the CAYIT was to talk about placement and specialized care for Fatima. Dr. Knox testified that in order to receive specialized care, a minor has to have certain medical issues, psychological issues, or behavioral issues that warrant more services from DCFS.

¶ 18    Dr. Knox further testified that whether a minor should receive specialized care is covered by section 301.90(b) of Title 89 of the Illinois Administrative Code (Code) (89 Ill. Adm. Code 301.90(b) (2010)), which states that the first thing that would need to occur would be a CAYIT

staffing, which did occur in this case. Dr. Knox testified that examples of minors that require specialized care included minors with an IQ of 70 or below, "which is in the mental retardation realm," minors with certain medical issues that require more hospitalization or more medical care, autistic children who tend to have moderate behavioral, perception, and sensory issues, children in need of behavioral care or who have highly sexualized behavior and cannot be around other children, and adolescents whose behavior has caused them to be placed in several different homes.

¶ 19     Dr. Knox acknowledged that the portion of the rule at issue here was whether Fatima had a medical or physical condition or impairment that required an extraordinary level of daily supervision or assistance. Dr. Knox testified that an example of a minor that would fall under this category would be one who had breathing tubes or walking instruments to aid in walking, or a child who had a brain injury that caused seizures. She further testified that children with Down's syndrome or paralysis or neurological problems would fall into this category.

¶ 20     Dr. Knox further testified that from what she remembered, Fatima was very active at home, was playful, "a joy to be with," inquisitive, and curious. Dr. Knox testified that Fatima did well in school and was a leader. She was able to get along with other kids "very well."

¶ 21     She further testified that Fatima would not qualify for specialized foster care when looking at the four factors listed in the Code: (1) the child's individual function in the home, school, and community; (2) the child's current or recommended involvement in identified services; (3) the child's degree of need; and (4) the caregiver's required level of participation in activities and/or services needed to meet the child's treatment and educational needs. Dr. Knox testified that Fatima would not qualify under the first provision because she was doing well and her medical needs were being taken care of. She had special lotion for her skin and had the appropriate medical checks on time. Dr. Knox testified that Fatima would not meet the second factor either because she was functioning well both at school and at home. In regard to the third factor, Dr. Knox testified that Fatima had received the medical care she needed and that Fatima was stable when she saw her. Finally, Dr. Knox testified that Fatima did not qualify under the fourth factor either because Melanie B. was meeting all of Fatima's needs.

¶ 22     Dr. Knox testified that the primary goal in regard to specialized foster care is to make sure that both the child and the family have the appropriate services in place to maintain a child in that home so there are no disruptions and the child receives the best care possible.

¶ 23     On cross-examination Dr. Knox stated that she was unaware that Fatima was in family therapy, that Fatima had been diagnosed with disruptive behavior disorder, that she was being treated for obsessive-compulsive behaviors, that she was being treated for paranoid behaviors, or that she required eight or more prescriptions a day. Dr. Knox testified that knowing those things would not change her opinion that Fatima's needs were being met, however, since Fatima was receiving those prescriptions and attending therapy and did not seem to need additional services.

¶ 24     DCFS then rested, and the ALJ asked Melanie B. a few additional questions. In response, Melanie B. stated that the prescriptions and the doctors were the only services covered by the medical card and that she wanted additional money. She was not receiving financial assistance with art therapy, food, drinks, soaps, shampoos, detergents, bedding, or air purifiers. Melanie B. testified that she was told that once Fatima was adopted, DCFS no longer had any responsibility for anything not provided by the medical card.

¶ 25    On June 14, 2011, the ALJ issued a recommendation and opinion, finding that Melanie B. did not meet her burden of proof, thereby denying her appeal from CAYIT's denial of specialized care. On September 1, 2011, plaintiff filed a complaint for administrative review in the circuit court. On April 26, 2012, the circuit court entered an agreed order remanding the matter to DCFS for reconsideration of the denial of specialization and for a supplemental hearing with instructions to allow new evidence as necessary, current up through the supplemental hearing date, with the burden of proof on DCFS instead of Melanie B.

¶ 26    A subsequent hearing was held on July 18, 2012. The ALJ noted that this hearing would leave off from the prior hearing, instead of resubmitting all the evidence and testimony that was given at that time. Tanya Parker, a DCFS worker assigned to Fatima's case, testified first. Parker testified that she was assigned to Fatima's case in May 2011 and that Fatima is now four years old. She testified that Fatima has visible eczema all over her body and has certain food and environmental allergies. Parker testified that Fatima has high anxiety.

¶ 27    Parker further testified that Fatima is allergic to dairy, grass, dander, mold, pollen, and cats. She is currently on medication for her allergies and has gone to see a specialist at North Shore University Health System. Dr. Rachel Story prescribed creams for Fatima's eczema. Parker testified that Fatima has asthma, but has prescribed medication for that, as well as a nebulizer. Parker testified that the doctor has stated that her allergies are currently under control.

¶ 28    Parker testified that Fatima went to the doctor in February 2012 for an asthma attack and was hospitalized in March 2012 for pneumonia.

¶ 29    Parker further testified that Fatima was in individual therapy for behavioral management. Brittany Neef, the therapist from Advocate Illinois Masonic Medical Center, was Fatima's therapist. Parker testified that Neef indicated in a June 13, 2012, report that Fatima was referred to the Pediatric Developmental Center for a comprehensive evaluation. It was then recommended after the comprehensive evaluation that Fatima needed group therapy. Fatima is currently on a waiting list for the group therapy. Parker testified that the parent must go to therapy first before the child can attend either group therapy or parent/child therapy, and that Melanie B. was currently in therapy. Parker testified that individual therapy ended in May 2012 when Neef left the practice. Parker testified that Fatima was still in art therapy at school.

¶ 30    Parker further testified that Fatima does not exhibit the same behaviors at school as she does in the foster home and that the school has not reported any concerns regarding Fatima's behavior. Parker testified that Fatima underwent a developmental and behavioral diagnostic summary on February 22, 2012, after which Dr. Cupoli stated Fatima exhibited anxiety issues.

¶ 31    Parker additionally testified that Fatima was referred to System of Care (SOC) in June 2012, due to "this appeal" and "things that were going on." Parker testified that members of SOC had met with Fatima at least four times and that, at the conclusion of the initial assessment, it was concluded that Fatima probably did not qualify for SOC services because she was receiving community-based services.

¶ 32    Parker testified that Melanie B. "absolutely" wanted to adopt Fatima and that Fatima functions in the home as if Melanie B. is her mother. Parker testified that Fatima is very attached to Melanie B. and very attached to Melanie B.'s biological daughter. Parker testified that Melanie B.'s mother lives upstairs from them and that Fatima is attached to her grandparents as well. During Parker's visits, Fatima "[e]ngages in play." Parker testified that Fatima has a nice bedroom and that Melanie B. makes sure all of Fatima's needs are met.

Parker further testified that Fatima is very aware of her allergies and problems and she has been "taught and trained" about them.

¶ 33    Parker testified that at school Fatima seems overall pleasant, but more of a loner. Other children have to engage Fatima in order for her to play with them. Fatima has had some incidents where she has gotten into fights with her peers or does not want to share, but that is not a daily occurrence.

¶ 34    On cross-examination, Parker testified that Melanie B. regularly reported "tantruming" and violence at home and that Fatima occasionally had paranoia. Parker further testified that Melanie B. had recently reported to her that Fatima had compulsive behaviors, that she was shutting down, and that she was exhibiting avoidance behaviors. Parker further stated that she was aware that Melanie B.'s biological daughter was seeking therapy because of Fatima's behavior in the home. Parker testified that all of Fatima's needs were being met and would continue to be met once adoption was finalized.

¶ 35    Melanie B. then testified on behalf of Fatima. She testified that Fatima is still allergic to soy, egg, citrus, all dairy, dog dander, wool, and bug spray. She testified that Fatima was seeing an allergist, Dr. Story, who was referred by Fatima's pediatrician. Melanie B. testified that she called Children's Memorial Hospital looking for a dermatologist for Fatima, but she was told to call back on August 13, 2012, as they were booked through October.

¶ 36    Melanie B. testified that a second series of allergy tests revealed that Fatima was allergic to cats, tall grass, birch trees, penicillin, dust mites, and cockroaches. Melanie B. testified that the treatment for Fatima's allergies is the same, except that two of the medications have increased in strength. The prescriptions and creams are covered by the medical card, but the lotions are not. Melanie B. testified that she has to purchase "extra that are not covered by the medical card because [she is] only allowed one each time." Melanie B. stated that she uses the medical card to purchase one prescription and then she pays out of pocket for duplicates or she buys a generic brand.

¶ 37    Melanie B. testified that in June 2013, Fatima went to the emergency room due to swelling on her throat after a lotion was applied. The emergency room doctor recommended a mold machine for Fatima, so Melanie B. purchased one for Fatima's bedroom as well as one for the living room, and DCFS did not reimburse her for either. The doctor also recommended an air-conditioner in the summer and a dehumidifier in the winter for her allergies and asthma.

¶ 38    Melanie B. testified that Fatima's behavior is still the same as it was when she testified at the prior hearing, but that Fatima's violent behavior and "tantruming" have increased.

¶ 39    Melanie B. further testified that Neef, at Illinois Masonic, recommended to Melanie B. that Fatima attend Erikson Institute because Neef "wasn't getting anywhere with her in therapy," and Fatima was having tantrums in therapy. Erikson Institute no longer had a contract with DCFS, however, so Neef referred her to the Pediatric Development Center (the Center). Melanie B. testified that she was taking parenting classes as a prerequisite to Fatima's ability to participate in group therapy but that she had been on a waiting list for a long time before getting into class because Fatima "has a medical card." Melanie B. testified that, today, Fatima is not in any services at the Center. The therapy sessions will be weekly when they start. Melanie B. further testified that she attempted to register Fatima in daycare at the Center once but was told it could not accommodate Fatima's allergy needs since other children brought in outside food that could not be controlled.

¶ 40     When asked what services, other than seeking a dermatologist, that Melanie B. needed assistance with, she stated that she was "still waiting on vouchers for *** the sheets, the bedding, pillow cases, the air machines." Melanie B. stated that she is trying to meet all of Fatima's needs at this time as best she can with the doctors and additional services, but Fatima is constantly changing. Melanie B. testified that right now, with the "services that are going to be put in place," she is meeting Fatima's needs.

¶ 41     Melanie B. further testified that Fatima has never been hospitalized and that she has only ever been to the emergency room. She testified that she has not talked to a doctor about getting a bigger dose of medication at a time, but she talked to the pharmacist who informed her that her "medical card only covers a certain amount."

¶ 42     Finally, Melanie B. testified that once she adopts Fatima, she will not get the extra money for gym class, bedding, air machines, and receipts "to purchase extra stuff." Melanie B. testified that she is only looking for more money, not specialized services.

¶ 43     On September 17, 2012, DCFS issued an opinion in which it noted that the issue on remand was whether a preponderance of the evidence supported DCFS's decision to deny Melanie B.'s request for specialized foster care. It made the following relevant findings of fact. Fatima was diagnosed with asthma, atopic eczema, acid reflux, problems with her ears, and mental health and anxiety issues that require constant attention. Fatima no longer has tubes in her ears, no longer has acid reflux or ear infections, and is on track for speech and language. Fatima is no longer in need of services for speech or language. She is still allergic to dairy products, is currently on "medication for allergy," and needs a nebulizer for asthma. Fatima was hospitalized in February 2012 for an asthma flare up. She needs group and individual child therapy. The decision stated that there were off-and-on behavioral problems at school and that Fatima had been involved in fights with boys. However, school reports showed that Fatima was doing well and did not state any concerns.

¶ 44     The ALJ further found that Fatima was receiving a special fee every six months and that she still had hypoallergenic issues. It further found that "[a]ll needs are being met by foster parent through community based services." It found no risk of harm to Fatima and that her current placement was safe. Since May of 2011, there had been no unusual incidents reported. The court further found that Fatima received $100 toward gym classes. DCFS further stated in its decision: "Dermatologist is booked until October, 2012; all creams covered by medical card accept [*sic*] one. Department did not pay for mold machine because no receipt was presented; no receipt was presented for dehumidifier; sheets, bedding and pillows are covered by DCFS."

¶ 45     The ALJ stated that Fatima was involved in gymnastics, which costs $430 for 20 sessions and $280 for short sessions. Lastly, the ALJ found that DCFS's witnesses testified credibly.

¶ 46     In addition to those findings of fact, the ALJ made conclusions of law. It found in pertinent part that DCFS had proven by a preponderance of the evidence that the decision made by DCFS to deny specialization was consistent with Fatima's needs regarding safety, well-being, and permanency pursuant to part 337 of Title 89 of the Code (89 Ill. Adm. Code 337).

¶ 47     In its analysis, the ALJ took judicial notice of the testimony and exhibits offered into evidence during the original hearing on May 20, 2011. The ALJ noted that DCFS argued that all of Fatima's needs were being met through current services "already being provided." The ALJ noted that Melanie B. located resources to help Fatima with her medical and behavioral needs and is committed to her well-being. It noted that Fatima was on a waiting list to receive occupational therapy at Illinois Masonic and that Fatima is in art therapy and will be

- 8 -

continuing these services. Melanie B. will be contacting Children's Memorial Hospital to inquire about a dermatologist appointment. Fatima's mental health needs "are also being addressed through a variety of service providers."

¶ 48    The ALJ found that "the Appellant[ ] could not show where the minor is in need of any services that were not already being addressed or that could only be provided through specialization." Moreover, the ALJ found, "there has been no showing that [DCFS] is not addressing the necessary services needed for [Fatima]." The ALJ continued, "[h]ere, [Fatima's] needs are being met through foster care services already available and in place." The ALJ found that DCFS sustained its burden and the decision to deny the request for specialization was reasonable and consistent with Fatima's needs with regard to safety, well-being, and permanency.

¶ 49    Plaintiff then appealed to the circuit court for administrative review pursuant to section 3-101 of the Illinois Code of Civil Procedure. 735 ILCS 5/3-101 (West 2012). The court issued a memorandum and order on October 8, 2013, in which it found, with regard to the question of law regarding whether DCFS properly applied the factors listed in section 301.90(b), that DCFS properly applied section 301.90(b) where it required a recommendation of the CAYIT and where evidence showed that the CAYIT reviewed the four factors in section 301.90(b) before determining specialized foster care was not needed.

¶ 50    For the mixed question of law and fact, of whether Fatima qualified for specialization, the court found that DCFS properly analyzed section 301.90(b), which outlines the assessment for specialization of a foster child. The court found that in taking the section into consideration, the ALJ properly considered each factor and found that Fatima did not qualify for specialization based on testimony and exhibits provided at the hearing. The court found that, therefore, the ALJ's decision was not clearly erroneous.

¶ 51    In terms of plaintiff's question of fact, regarding whether the ALJ's decision was against the manifest weight of the evidence, the court found that the evidence supported the ALJ's decision to deny Melanie B.'s request for specialization. The court found that the ALJ had considered testimony from Dr. Knox, Melanie B., and Tanya Parker regarding Fatima's medical and behavioral issues and needs. The ALJ found those witnesses to be credible and agreed with the conclusion of Dr. Knox that Fatima did not qualify for specialization. Accordingly, the court found that the record supported the findings of the ALJ and that the decision was therefore not against the manifest weight of the evidence.

¶ 52    Lastly, plaintiff argued that the ALJ violated Fatima's due process rights and the Illinois Administrative Procedure Act by imposing requirements for eligibility beyond those in DCFS rules. The court found that plaintiff did not provide the court with any evidence to support the proposition that DCFS's decision was arbitrary or unreasonable. The court affirmed the ALJ's decision and dismissed plaintiff's complaint for administrative review. Plaintiff now appeals.

¶ 53                                    ANALYSIS

¶ 54    Plaintiff contends on appeal that the final administrative decision by the ALJ was (1) against the manifest weight of the evidence where it found that all of Fatima's needs were being met despite her severe eczema and the fact that she had not yet seen a dermatologist; (2) legally erroneous where it ignored the benefits of the specialization program and added an improper requirement; (3) clearly erroneous where if found that DCFS had met its burden of showing that denial of specialization was consistent with Fatima's well-being despite Fatima's

physical and behavioral issues that required constant attention; and (4) arbitrary and capricious in failing to consider important aspects of Fatima's conditions and improperly adding a requirement for specialized care. For the following reasons, we affirm the final administrative decision.

¶ 55 The Administrative Review Law provides that a final decision of the circuit court reviewing the decision of an administrative agency is "reviewable by appeal as in other civil cases." 735 ILCS 5/3-112 (West 2012). This court reviews the agency's decision, not the circuit court's decision. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006).

¶ 56 Standard of Review

¶ 57 At the hearings in this case, DCFS carried the burden of proof in showing, by a preponderance of the evidence, that the decision made by CAYIT to deny specialization was in the best interests of the child "in accordance with professional social work standards and [DCFS] administrative rules." 89 Ill. Adm. Code 337.170(a) (2002); 89 Ill. Adm. Code 337.30(d), amended at 26 Ill. Reg. 6246 (eff. June 1, 2002). On administrative review, the standard of review applied depends on the issues presented: a question of fact, a question of law, or a mixed question of fact and law. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008).

¶ 58 Where the question of an agency's decision is one of fact, an administrative agency's findings and conclusions of fact are deemed to be *prima facie* true and correct. 735 ILCS 5/3-110 (West 2012); *O'Boyle v. Personnel Board*, 119 Ill. App. 3d 648, 653 (1983). In examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of the agency. *Cinkus*, 228 Ill. 2d at 210. If the issue before the reviewing court is merely one of conflicting testimony and credibility of witnesses, the administrative board's decision should be sustained. *O'Boyle*, 119 Ill. App. 3d at 653. A reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998). An administrative agency's factual findings are against the manifest weight of the evidence if no trier of fact could have agreed with the agency or an opposite conclusion than that reached by the agency is clearly evident. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504 (2007).

¶ 59 When an agency's decision deals with a question of law, the agency's findings are not binding on a reviewing court and the agency's decision is reviewed *de novo*. *Cinkus*, 228 Ill. 2d at 210.

¶ 60 And finally, mixed questions of law and fact are questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard. *Cinkus*, 228 Ill. 2d at 211. Where a question of an agency's decision is a mixed question of law and fact, it is subject to the "clearly erroneous" standard of review. *Marconi*, 225 Ill. 2d at 532. An administrative agency's decision is deemed "clearly erroneous" when the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Cinkus*, 228 Ill. 2d at 211.

¶ 61 Plaintiff contends that all three standards of review apply in this case.

Decision Contrary to Manifest Weight of Evidence

¶ 63        Plaintiff's first contention on appeal is that the ALJ's decision made certain fact findings that were against the manifest weight of the evidence. We first reiterate that in determining whether the decision of the agency was against the manifest weight of the evidence, it is not our function to reweigh the evidence or to make an independent determination of the facts. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). The mere fact that an opposite conclusion is reasonable or that a reviewing court might have ruled differently will not justify reversal of the findings of fact. *Id*. "If the record contains evidence to support the agency's decision, it should be affirmed." *Id*. Additionally, we note that an administrative agency is only required to provide a record and findings to permit orderly and efficient review, and if the testimony at the hearing is preserved in the record, as it was in this case, "specific fact-findings are not required." *Kimball Dawson, LLC v. City of Chicago Department of Zoning*, 369 Ill. App. 3d 780, 787 (2006).

¶ 64        Here, plaintiff contends that certain findings of fact were against the manifest weight of the evidence because: (1) all of Fatima's needs were not being met where she had yet to see a dermatologist; (2) the ALJ's decision did not acknowledge that she was allergic to soy, egg, citrus, dog dander, wool, bug spray, cats, tall grass, birch trees, penicillin, mold, dust mites, and cockroaches, or her severe reactions to these allergens; (3) the decision did not indicate the extreme severity of her eczema or the fact that she had contact dermatitis; (4) while the ALJ's decision mentioned that she was "on medication for allergy," it did not acknowledge that she was on nine daily medications for her allergies; (5) while the ALJ found that all of her creams were covered by the medical card except one, it did not acknowledge that Melanie B. had to provide duplicates of all of Fatima's medications to the school; (6) the ALJ's findings of fact stated that the hypoallergenic equipment was not paid for by DCFS because no receipts were presented to DCFS despite the fact that Melanie B. testified she was never asked for a receipt and was told DCFS would not pay for such expenses; (7) the decision stated that there had been no unusual incidents reported since May 2011 despite Melanie B.'s testimony that Fatima had been hospitalized for severe allergic reactions; (8) the ALJ found that Fatima's needs were met through community-based services despite the fact that Fatima was not in therapy; (9) the ALJ omitted the fact that Fatima was diagnosed with disruptive behavior disorder, as well as a sensory regulatory disorder; and (10) the decision stated that Fatima was doing well in school when in fact there had been fights with other children.

¶ 65        We first note that in regard to plaintiff's arguments that the ALJ failed in its findings of fact to list all of Fatima's specific allergens, failed to list Fatima's specific medications, failed to state the severity of Fatima's eczema or the fact that she had contact dermatitis, failed to note that Melanie B. had to provide duplicate prescriptions to Fatima's school, and failed to state that Fatima had both a sensory regulatory disorder and disruptive behavior disorder, "specific fact-findings are not required" where the testimony at the hearing was preserved in the record. *Kimball Dawson*, 369 Ill. App. 3d at 787. Here, the testimony regarding all of these omissions in the ALJ's findings of fact is contained and preserved in the record and therefore was considered by the ALJ. Accordingly, we cannot find that the findings of fact were against the manifest weight of the evidence merely because not every fact presented at the hearings was included.

¶ 66        Plaintiff next takes issue with the ALJ's finding that DCFS "did not pay for mold machine because no receipt was presented for dehumidifier." Plaintiff contends that this finding is

against the manifest weight of the evidence because Melanie B. testified that she had never been asked for a receipt and was told by caseworkers for DCFS that DCFS would not pay for such expenses. We note, however, that if the issue before a reviewing court is merely one of conflicting testimony and credibility of witnesses, the administrative board's decision should be sustained. *O'Boyle*, 119 Ill. App. 3d at 653. Here, Parker, the caseworker, specifically testified that no receipts had been presented to her and she did not tell Melanie B. that such expenses were not covered. Moreover, there was testimony that Melanie B. had submitted vouchers and was still waiting to be reimbursed.

¶ 67    Plaintiff further contends that the finding that there had been no unusual incidents reported since May 2011 was against the manifest weight of the evidence because Melanie B. testified that Fatima had been hospitalized three times for severe allergic reactions, and Melanie B. had notified the caseworker each time. Tonya Parker testified at trial that she had only been notified of one trip to the hospital in February 2012. The ALJ specifically found in its findings of fact that "[Fatima] was hospitalized in February, 2012 for asthma flare up." To the extent that the ALJ did not specifically find that Melanie B. had reported the other two hospitalizations, that decision should be sustained since it is merely one of conflicting testimony and credibility of witnesses. *O'Boyle*, 119 Ill. App. 3d at 653. Accordingly, we do not find that the ALJ's finding that there were no unusual incidents reported since May 2011 was against the manifest weight of the evidence.

¶ 68    Plaintiff further contends that the ALJ's finding that Fatima was doing well in school was against the manifest weight of the evidence because "the school had reported to the caseworker about fights that [Fatima] had had with other children, and described her behavior as 'out of the norm.' " The entire finding of fact made by the ALJ reads: "There are off and on behavior problems at school; [Fatima] has been involved in fights with boys in school; school reports minor is doing well, did not state any concerns." We find that this is not against the manifest weight of the evidence where Parker testified that the school had not reported any concerns regarding Fatima's behavior, and Dr. Knox testified that Fatima was functioning well in school. See *O'Boyle*, 119 Ill. App. 3d at 653 (findings of agency should be sustained if merely one of conflicting testimony and credibility of witnesses). The fact that Fatima gets into occasional fights at school does not refute the testimony that she was doing well in school, which the ALJ's findings of fact reflected.

¶ 69    Plaintiff next contends that the finding that Fatima's needs were being met through community-based services was against the manifest weight of the evidence because Fatima was not currently in individual therapy. However, at the second hearing, Parker testified that Fatima's individual therapy was on hold while Melanie B. completed parenting classes. Moreover, Melanie B. testified that once she completely her parenting classes, Fatima was eligible for individual, group and child/parent therapy and had been placed on a wait list for those services. Accordingly, we find that the ALJ's finding that Fatima's needs were being met through community-based services was not against the manifest weight of the evidence, as Fatima was scheduled to begin individual therapy as soon as Melanie B. completed her parenting class.

¶ 70    Finally, plaintiff contends that the ALJ's finding that Fatima's needs were being met was against the manifest weight of the evidence where she had not yet seen a dermatologist. However, Melanie B. testified at trial that she called Children's Memorial Hospital looking for a dermatologist but was told to call back in August 2012, to make a future appointment since

the dermatologist was booked through October 2012. The fact that the dermatologist office could not accommodate Fatima at the time of the hearing does not mean that Fatima's needs were not being met. It is apparent from the record that the dermatologist office anticipated openings after October, and could accommodate Fatima at that time. Accordingly, it was not against the manifest weight of the evidence for the ALJ to find that Fatima's needs were being met despite the fact that Fatima had not yet been able to see a dermatologist. Rather, "[i]f the record contains evidence to support the agency's decision, it should be affirmed." *Abrahamson*, 153 Ill. 2d at 88.

¶ 71                    ALJ's Finding That DCFS Met Its Burden Clearly Erroneous

¶ 72    We next address plaintiff's contention that the ALJ's finding that DCFS met its burden of proof in showing, by a preponderance of the evidence, that the denial of specialization was in the best interests of Fatima, was clearly erroneous.

¶ 73    At the hearings in this case, DCFS carried the burden of proof in showing, by a preponderance of the evidence, that the decision made by CAYIT to deny specialization was in the best interests of the child and was consistent with the child's needs regarding safety, well being, and permanency. 89 Ill. Adm. Code 337.170(a) (2002); 89 Ill. Adm. Code 337.30(d), amended at 26 Ill. Reg. 6246 (eff. June 1, 2002).

¶ 74    Section 301.90(b) of Title 89 of the Code defines what makes a child eligible for specialized services. It states that DCFS "shall provide specialized foster care services for a child *** who requires such services due to emotional, behavioral, developmental or medical needs, or any combination thereof, or any other needs which require special intervention services." 89 Ill. Adm. Code 301.90(b) (2010).

¶ 75    Examples of medical conditions that may require specialized foster care services, as provided by the Code, include, but are not limited to: a life-threatening disease; dependence on life-saving equipment like a ventilator, dialysis, or oxygen; a medical/physical condition or impairment that requires an extraordinary level of daily supervision and/or assistance; quadriplegia; severe physical limitations due to multiple physical conditions; hospitalization for psychiatric reasons; or being a sexual perpetrator. 89 Ill. Adm. Code 301.90(b)(2) (2010). Examples of behavioral and mental health issues that may warrant consideration for specialized care include, but are not limited to: sexual victimization; sexual aggression; fire setting; juvenile delinquency; compulsive behaviors; mental retardation; or substance abuse problems or mental illness. 89 Ill. Adm. Code 301.90(b)(3) (2010).

¶ 76    When assessing whether a child with one of the above conditions requires specialized foster care services, DCFS "shall also consider the following 4 factors, cumulatively": (1) the child's individual functioning in her home, school, and community; (2) the child's current or recommended involvement in identified services; (3) the child's degree of need as defined by the recommended intensity and/or frequency of services; and (4) the caregiver's required level of participation in activities and services needed to meet the child's treatment and educational needs. 89 Ill. Adm. Code 301.90(b)(4) (2010).

¶ 77    Plaintiff contends that Fatima "clearly fits" the standard articulated in section 301.90(b) for specialization because she has a "medical/physical condition that requires extraordinary supervision." Plaintiff contends that Melanie B. must monitor her special diet and purchase special equipment for her home, which must frequently be replaced and are not covered by her medical card. Plaintiff further contends that Melanie B. must bring Fatima to several doctors,

must administer daily medications, and must make sure Fatima's school has duplicate medications. Plaintiff contends that the Code indicates that asthma, compulsive behaviors, or mental illness could qualify a child for specialization and that Fatima has these issues. Further, plaintiff contends that looking at the four factors listed in the Code, Fatima should have received specialized treatment.

¶ 78    We first note that the examples of medical, physical, and behavioral conditions listed in the Code are described as conditions that "may" require specialized foster care services. The Code then goes on to state that when assessing whether a child with one of those listed conditions requires special services, DCFS shall also consider four factors, cumulatively. Accordingly, the fact that Fatima has any of the enumerated medical, physical, or behavioral conditions does not automatically result in a finding of specialization. In this case, all four factors were considered, and thus we cannot say that the decision to deny Fatima specialization was clearly erroneous.

¶ 79    In terms of Fatima's individual functioning at home, at school, and in the community, Parker testified that Fatima's school had not reported any concerns regarding Fatima's behavior, but that she was difficult to engage and had gotten into fights with her peers in the past. Parker testified that Fatima engages in play during her visits, she has a nice bedroom, and Melanie B. makes sure all of Fatima's needs are being met. While Fatima has extensive allergies, Parker testified that she was on medication for all of her allergies, and that they were under control. Melanie B. testified that Fatima exhibited "tantruming" and violent behavior at home.

¶ 80    Looking at Fatima's current and recommended involvement in identified services, as well as the degree of need as defined by the recommended intensity and frequency of services, Parker testified that Fatima was in art therapy, is on a waitlist for group therapy, and will be back in individual therapy once Melanie B. completes parenting class. Parker further testified that Fatima saw a specialist for her allergies and has prescription medication and creams to treat them. Melanie B. testified that Fatima has not yet been to see a dermatologist, but was told to call back in August to book an appointment after October. Melanie B. also testified that she was paying out of pocket for the home equipment replacements, and the duplicate medications for Fatima's school. She further testified that with the services that were going to be put in place, she was meeting Fatima's needs.

¶ 81    Finally, in looking at the caregiver's required level of participation in activities and services needed to meet the child's treatment and educational needs, we recognize that Melanie B.'s required involvement is certainly extensive. She has to administer prescription medications daily, apply prescription creams daily, take Fatima to and from several therapy appointments a week, as well as frequent doctor appointments, adhere to Fatima's strict diet, provide duplicate medications and creams to Fatima's school, and keep her home hypoallergenic. Melanie B. testified that while Fatima's needs are currently being met, she needs more money to purchase duplicate medications, to purchase food that Fatima is not allergic to, and to purchase replacement equipment for her home. However, as the ALJ noted, Melanie B. had never attempted to be reimbursed for the duplicate medications or the replacement equipment for her home, and she had never asked a doctor for duplicate medications. Moreover, considering these four factors cumulatively, we find that the ALJ's decision that DCFS met its burden of proof in showing by a preponderance of the evidence that the denial of specialization was in the best interests of Fatima was not clearly erroneous, as we

are not left with the definite and firm conviction that a mistake has been committed. *Cinkus*, 228 Ill. 2d at 211.

¶ 82                    Consideration of Current Foster Care Services

¶ 83    Plaintiff also contends that the ALJ improperly considered the current foster care services Fatima was receiving in determining whether or not her needs were being met. Specifically, plaintiff contends that the Code "nowhere states that simply because a child is getting the services she requires, she is not eligible for the benefits of specialization." The only citation to authority for this proposition, without explanation, is *Collinsville Community Unit School District No. 10 v. Regional Board of School Trustees*, 218 Ill. 2d 175, 181 (2006). After reviewing *Collinsville*, we are unsure of how it relates to this case, as it is a case about the failure of a school district to name and serve city residents as defendants.

¶ 84    However, we find that the ALJ considered the proper factors in determining whether Fatima was eligible for specialization. The Code states that DCFS shall provide specialized foster care services for a child who requires such services due to emotional, behavioral, development, or medical needs, or any combination thereof, or any other needs which require special intervention services. 89 Ill. Adm. Code 301.90(b) (2010). The Code further states that a child's eligibility for specialized foster care services shall be determined based upon the recommendation of CAYIT. 89 Ill. Adm. Code 301.90(b)(1)(B) (2010). There is no dispute that CAYIT held a staffing on October 18, 2010, and as a result denied Melanie B.'s request for specialization. The Code then gives examples of medical and behavioral conditions that could warrant specialization, as discussed above, and then lists the four factors that should be used in assessing whether a child with a described condition requires specialized foster care services. 89 Ill. Adm. Code 301.90(b)(4) (2010). One of the factors is the "child's current or recommended involvement in identified services," and another factor is the child's degree of need as defined by the intensity and frequency of services. *Id*. Accordingly, the Illinois Administrative Code specifically indicates that current foster care services should be considered in deciding whether Fatima is eligible for specialized services, and thus we cannot find that the ALJ's consideration of these services was legally erroneous.

¶ 85                            Arbitrary and Capricious

¶ 86    Plaintiff's final argument on appeal, that the ALJ's decision was arbitrary and capricious in that it imposed requirements for eligibility beyond those in the DCFS rules, must also fail for the same reasons stated above. The ALJ properly considered the necessary factors in concluding Fatima was ineligible for specialization.

¶ 87                                CONCLUSION

¶ 88    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County upholding the decision of the Director.

¶ 89          Affirmed.