2024 IL App (1st) 221660-U

No. 1-22-1660

Order filed April 8, 2024

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| RICO DE GUIA, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CH 199 |
| | ) | |
| THE ILLINOIS CIVIL SERVICE COMMISSION, | ) | |
| THOMAS KLEIN, in His Official Capacity as Executive | ) | |
| Director of the Illinois Civil Service Commission, | ) | |
| TIMOTHY SICKMEYER, in His Official Capacity as | ) | |
| Chairman of the Illinois Civil Service Commission, G.A. | ) | |
| FINCH, DAVID LUECHTEFELD, VIVIAN | ) | |
| ROBINSON, and TERESA SMITH, in Their Official | ) | |
| Capacities as Illinois Civil Service Commissioners, THE | ) | |
| DEPARTMENT OF HUMAN SERVICES, DULCE | ) | |
| QUINTERO, in Her Official Capacity as Secretary of | ) | |
| Human Services, THE DEPARTMENT OF CENTRAL | ) | |
| MANAGEMENT SERVICES, RAVEN A. DEVAUGHN, | ) | |
| in Her Official Capacity as Acting Director of Central | ) | |
| Management Services, and ERIN O'BOYLE, in Her | ) | |
| Official Capacity as Deputy Director of Labor Relations | ) | |
| of the Department of Central Management Services, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

No. 1-22-1660

(The Illinois Civil Service Commission, The Department )
of Human Services, Dulce Quintero, in Her Official )
Capacity as Secretary of Human Services, The )
Department of Central Management Services, and Raven ) Honorable
A. DeVaughn, in Her Official Capacity as Acting Director ) Neil H. Cohen,
of Central Management Services, Defendants-Appellees). ) Judge, presiding.

---

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the circuit court's decision upholding the determination of the Illinois Civil Service Commission that plaintiff made an inappropriate comment to a coworker and his conduct provided cause for discharge.

¶ 2    Plaintiff Rico De Guia appeals from the circuit court's order upholding the decision of the Illinois Civil Service Commission (Commission) that his discharge from employment with the Department of Human Services (DHS) was warranted.[1] He argues that the Commission's factual findings were against the manifest weight of the evidence and its decision that his discharge was warranted was unreasonable. For the following reasons, we affirm.

¶ 3    Plaintiff was employed by DHS as a security therapy aide (STA) at Elgin Mental Health Center. On February 4, 2021, Remedios Tiu filed an employee discrimination complaint against plaintiff alleging sexual harassment. The record reflects that both plaintiff and Tiu spoke Tagalog as well as English. Plaintiff allegedly spoke to Tiu in mixed Tagalog and English during the

---

[1] Plaintiff originally named as defendants Grace Hou, then Secretary of Human Services and Janel Forde, then Director of Central Management Services. The circuit court substituted Forde with Anthony Pascente as he succeeded Forde as Acting Director. See 735 ILCS 5/2-1008(d) (West 2022). We similarly replace Pascente with Raven A. DeVaughn, and replace Hou with Dulce Quintero, as DeVaughn and Quintero, respectively, have succeeded Pascente's and Hou's positions. *Id.* The circuit court also dismissed as improper or unnecessary parties Thomas Klein, Timothy Sickmeyer, G.A. Finch, David Luechtefeld, Vivian Robinson, Teresa Smith, and Erin O'Boyle.

underlying incident; testimony indicated that speaking a blend of Tagalog and English is common among speakers of both languages. The Bureau of Civil Affairs (Bureau) investigated Tiu's complaint and found it substantiated. A human resources representative conducted a pre-disciplinary hearing and recommended suspending plaintiff for 30 days pending discharge for cause.

¶ 4     On September 15, 2021, the Department of Central Management Services (CMS) notified plaintiff that DHS had filed a charge seeking to terminate him for conduct unbecoming of a state employee and CMS had approved his discharge. DHS charged that, on February 3, 2021, plaintiff said to Tiu, "You are showing me your nipple," and that her nipple was "pinkish red." The Statement of Charges further reflected that plaintiff had been suspended for 30 days in 2007 for sexual harassment. Plaintiff filed a written request for a hearing before the Commission.

¶ 5     On October 20, 2021, the Commission held a hearing. Tiu testified that she was a charge nurse at the Elgin Mental Health Center, and supervised the other nurses and STAs during her shift from 3 p.m. to 11 p.m. Her responsibilities included recording attendance and approving overtime. Plaintiff was an STA during the morning shift, so Tiu did not work with him. However, on February 2, 2021, the person who was scheduled to replace plaintiff for the 3 p.m. shift arrived about one minute late. Since it occurred during Tiu's shift, she signed a form awarding plaintiff one minute of overtime credit.

¶ 6     At 3 p.m. the next day, February 3, 2021, Tiu retrieved a gown from an area where personal protective equipment (PPE) was stored. She realized she had forgotten her key in a locked room. She saw plaintiff near the PPE station and asked him to unlock that room. He followed her down a hallway where social workers' offices were located and, as they approached the locked room, he

said, "oh, you're showing your nipples." Tiu asked what he was talking about and he continued, "yeah, I saw it it's pinkish red." Plaintiff said everything in Tagalog except "pinkish red," which he said in English. When she entered the locked room, Tiu saw another staff member, Melissa Doruelo, standing inside. Tiu did not say anything else to plaintiff. She called her manager and reported plaintiff's comment. The next day, she filed a complaint against plaintiff.

¶ 7    On cross-examination, Tiu testified that STAs were assigned to specific posts which they could not leave uncovered. However, they could, for example, "step out and *** remove their gown." Tiu did not specifically remember plaintiff requesting overtime on February 2, 2021. On February 3, 2021, Tiu arrived "minutes before" 3 p.m. She entered the "chart room" to put her bag away, and went to a nurses' station. She then realized she needed a gown and went to the PPE station, which was a cart in the hallway. She saw plaintiff standing in the area where STAs normally wait to leave "because they have to remove their gown and throw it in there." She asked him to unlock the chart room door.

¶ 8    Plaintiff unlocked the chart room door and Tiu pushed it open. He did not follow her into the room. Immediately to the right in the chart room is a door to a doctor's office which was always propped open. The chart room door pushes open to the right, partially blocking the doctor's office. Doruelo was in the chart room within arm's length of the entrance, but Tiu could not remember her exact position. Tiu returned to the nurses' station and signed the attendance form at 3 p.m., approximately one minute after she first entered the unit. Tiu did not tell Doruelo about plaintiff's statement, but Doruelo approached Tiu during the shift and asked what happened and why she heard the word red. Tiu told her what happened, but Doruelo first used the word "red." Tiu reported the incident to her manager, emailed human resources, and towards the end of her shift prepared a

handwritten statement that she gave to a security officer. She indicated in the statement that the "whole conversation was in Tagalog."

¶ 9    Responding to questions from the administrative law judge (ALJ), Tiu testified that she was fluent in Tagalog, had heard plaintiff speak Tagalog before, and never had trouble understanding him. It was common to mix English and Tagalog phrases. Plaintiff and Tiu walked approximately 20 feet from where she first encountered him to the chart room, which took 10 or 15 seconds.

¶ 10    Doruelo testified that she also spoke Tagalog. At approximately 3 p.m. on February 3, 2021, she was inside the doctor's office within the chart room. Tiu entered the chart room and Doruelo saw plaintiff behind her in the doorway. Tiu was upset and Doruelo asked what was going on. Doruelo could not understand what Tiu was saying "except the word red." Doruelo later asked Tiu what happened and Tiu told her that plaintiff said something "about her nipple." Doruelo denied hearing Tiu and plaintiff's conversation.

¶ 11    Doruelo acknowledged that on February 3, 2021, she gave a handwritten statement to the security officer providing that she saw Tiu enter the chart room from the social worker hallway with plaintiff behind her, but did not hear their conversation except the word red. Doruelo testified that she wrote she heard "red" because "on this statement I did not elaborate everything. I know that I asked what's going on. And he said something, but I couldn't understand it except the word red." The word red was in English.

¶ 12    On cross-examination, Doruelo testified that she was putting on her PPE "[j]ust in front" of the doctor's office door when Tiu entered the chart room. Plaintiff stood behind Tiu in the partially open door. The chart room door did not obstruct the view from the doctor's office as the

doctor's office door is always open and the chart room door has glass. Plaintiff and Tiu were speaking Tagalog.

¶ 13    After Doruelo put on her PPE she asked Tiu what happened and Tiu said she forgot her key and asked plaintiff to open the door for her. According to Tiu, plaintiff said that Tiu was showing him her "pinkish reddish nipple." Tiu said "pinkish reddish" in English but the rest in Tagalog. Tiu first used the words pinkish red.

¶ 14    On redirect examination, Doruelo agreed that she heard plaintiff say the word "red." Responding to questions from the ALJ, Doruelo confirmed that she recognized plaintiff when she saw him through the window on the chart room door.

¶ 15    Crystal Schilling, a human resources specialist at the Elgin Mental Health Center, identified sections of DHS's employee handbook providing for employee conduct and discrimination and harassment policies, administrative directives on the same topics, and the State of Illinois Code of Personal Conduct. The employee conduct policy included that employees are to conduct themselves responsibly and professionally and are not to use vulgar or profane language or demonstrate inappropriate or discourteous behavior. The discrimination and harassment policy and the Code of Personal Conduct prohibited sexual harassment. Violating the policies could result in discharge.

¶ 16    Schilling further testified that, on February 3, 2021, or February 4, 2021, Tiu emailed her about the incident with plaintiff. Schilling also received a copy of Tiu's statement to security. The Bureau investigated the case and substantiated Tiu's allegation. Schilling then scheduled a pre-disciplinary hearing and drafted the charge against plaintiff. Following the hearing, she served plaintiff with a 30-day suspension pending discharge, which had to be approved by CMS and the

labor relations division of DHS. Schilling identified a discharge packet she compiled which included plaintiff's most recent annual performance evaluation for the period of March 1, 2020, to February 28, 2021. The evaluation is included in the record on appeal and indicates that plaintiff met or exceeded his supervisor's expectations in all areas except his use of time.

¶ 17    Schilling recommended plaintiff be discharged given the importance of creating a safe work environment for DHS employees and the patients, and as he had already served a 30-day suspension for a prior instance of sexual harassment. She testified it was especially important to keep the facility comfortable for everyone as the facility cared for "vulnerable mentally ill patients." She did not consider lesser discipline given plaintiff's prior suspension and his "pretty egregious behavior." Schilling noted that DHS used progressive discipline but did not issue suspensions exceeding 30 days, which plaintiff had already received. Schilling identified a report in the discharge packet detailing plaintiff's disciplinary history, which the parties stipulated was accurate. The report, included in the record on appeal, reflects that plaintiff was suspended for 30 days in 2007 for personal conduct and had received several other 1- or 3-day suspensions and written reprimands. In this case, Schilling did not consider another 30-day suspension as plaintiff's prior 30-day suspension did not correct his behavior.

¶ 18    On cross-examination, Schilling identified statements to security from several other employees who indicated they did not see plaintiff interact with anyone on his way out of the unit on February 3, 2021. Following its investigation, the Bureau recommended plaintiff be disciplined for violating DHS's sexual harassment policy and mandated to take sexual harassment training. DHS did not require plaintiff to take sexual harassment training pursuant to the Bureau's recommendation as DHS knew it would pursue his discharge and the Bureau was unaware of

plaintiff's disciplinary history. Schilling thought the personnel code might prohibit suspensions longer than 30 days as she had worked at DHS for 5 years and never issued a longer suspension. She explained that it did not matter that plaintiff's prior discipline for sexual harassment was 14 years prior as that sort of discipline did not "roll off" an employee's record.

¶ 19     DHS also presented the testimony of two witnesses who authorized plaintiff's discharge on behalf of the DHS Secretary and the CMS Director.

¶ 20     Plaintiff testified that he had worked for DHS since August 2000 and had been an STA since 2017. His main duty was to transport patients, but if no patient needed transportation he would be assigned to a regular post and do "face checks" every 15 minutes. When a shift ended, he needed to wait for the person on the next shift to arrive and for the charge nurse to approve his departure. On a floor plan of the unit, he identified the nurses' station where he would wait for another person to relieve him and from which he could still observe patients.

¶ 21     On February 2, 2021, a charge nurse told plaintiff to wait at the end of his shift for a person who was late. He asked Tiu to sign his overtime form and she grew angry, stating that he should ask the charge nurse for his shift, Tiu's sister-in-law, who was still there. Plaintiff told her not to bring her family problems to work and she seemed annoyed. He did not see her sign the form.

¶ 22     On February 3, 2021, plaintiff was at the "tech station" with four others waiting to leave from about 2:55 p.m. to 3 p.m. He left with the others. He signed out on the attendance sheet at about 2:58 p.m. but wrote 3 p.m. He had no reason to be in the social worker hallway, did not go to the chart room, and did not recall seeing Tiu or Doruelo on the way out. He denied making any inappropriate remarks.

¶ 23 Responding to questions from the ALJ, plaintiff identified the social worker hallway, nurses' station, tech station, chart room, and doctor's office on the floor plan of the unit. The floor plan is included in the record on appeal and has been reviewed by this court.[2] Plaintiff testified the tech station was a desk just outside the nurses' station. He explained there were double doors between the nurses' station and the social worker hallway. Staff did not need a key to pass those doors when going from the hallway to the nurses' station, but needed one to exit the unit going from the nurses' station to the hallway. On February 3, 2021, the relieving staff members arrived at about 2:59 p.m. but the leaving members had to stay until 3 p.m. Plaintiff stayed at the tech station during that minute as he was required to monitor his post until 3 p.m. As there were four nurses on each shift, there were eight nurses present around 3 p.m. and it would have been impossible for him to go to the chart room without being seen.

¶ 24 Lasonya Simmons testified that in February 2021 she was an STA who worked the same shift as plaintiff. STAs had to notify someone whenever they left their posts so patients were not left unattended. They could not leave at the end of their shift until their replacement arrived and a nurse at the tech station said they could leave.

¶ 25 The STAs normally gathered at the tech station to leave at 2:55 p.m. They did the same on February 3, 2021. That day they left together at 3 p.m. and did not turn into the social worker hallway. Simmons remembered that day specifically because plaintiff did not usually leave with the rest of the group. She did not recall seeing Tiu or Doruelo on the way out and denied hearing plaintiff make any inappropriate comments.

---

[2] Also included in the record on appeal is a cropped image of the floor plan that the ALJ attached to the proposed decision, on which the ALJ marked the locations of the social worker hallway, chart room, doctor's office, and nurses' station.

¶ 26 On cross-examination, Simmons testified that STAs generally entered the social worker hallway several times a day. On redirect examination, Simmons testified that an STA could enter the social worker hallway without getting coverage for his or her post but it was not recommended. Responding to questions from the ALJ, Simmons denied remembering what time plaintiff arrived at the tech station on February 3, 2021.

¶ 27 On December 3, 2021, the ALJ issued a proposal for decision. The ALJ concluded that DHS proved its charge by a preponderance of the evidence. In its findings of fact, the ALJ found that, a few minutes before 3 p.m. on February 3, 2021, Tiu entered the chart room, put her bag down, and went to the social worker hallway for a gown. She realized she had left her keys in her bag in the chart room. She encountered plaintiff in the social worker hallway and asked him to unlock the chart room. Plaintiff agreed, walked with her to the door, and said in Tagalog that she was showing him her nipples. Tiu asked what he was talking about and plaintiff said, "Yeah, I saw it. It's pinkish-red," in Tagalog, except "pinkish-red" was in English.

¶ 28 The ALJ found that inconsistencies in Tiu's and Doruelo's accounts, such as Doruelo's exact positioning and the fact that Tiu testified that "pinkish-red" was in English but wrote in her statement to the security guard that the whole conversation was in Tagalog, did not discredit Tiu's testimony. The ALJ noted that Doruelo's testimony was unclear about whether she heard plaintiff or Tiu say the word red, but she clearly testified that she saw plaintiff behind Tiu outside the chart room. Moreover, Simmons testified the STAs enter the social worker hallway several times a day and Tiu testified there was a cart with PPE in the social worker hallway and STAs have to return their gowns at the end of their shift.

¶ 29    Although plaintiff's testimony that he was waiting near the nurses' station for release was corroborated by Simmons's testimony, the ALJ further noted that Simmons did not recall exactly what time plaintiff arrived at the nurses' station and Tiu testified their interaction occurred a few minutes prior to 3 p.m.[3] Thus, the ALJ concluded that Tiu's and Doruelo's testimonies were credible and the "most likely scenario" was that plaintiff interacted with Tiu a few minutes before 3 p.m., before going to the nurses' station to be released. Moreover, plaintiff and Tiu's interaction on February 2, 2021, regarding plaintiff's overtime form was unlikely to motivate Tiu and Doruelo to conspire to tell a fake story about plaintiff.

¶ 30    The ALJ further concluded that plaintiff's discharge was warranted. The ALJ noted that "some factors *** would weigh in favor of a lesser punishment," as plaintiff had been employed at DHS for more than 20 years and his most recent evaluation was largely positive. However, the ALJ found that plaintiff's statement to Tiu was "inexcusable," his discharge protected other employees' right to be free from objectification and hostility and protected DHS from potential litigation, and plaintiff's prior 30-day suspension supported discharge.

¶ 31    Plaintiff filed a written response to the proposal for decision. On December 16, 2021, the Commission adopted the ALJ's proposal, finding the charge proven and discharge warranted. Plaintiff filed a complaint for administrative review in the circuit court, and on October 3, 2022, the court affirmed the Commission's decision.

¶ 32    Plaintiff now appeals. As this is an appeal in an administrative review case, we do not review the circuit court's decision but rather the decision of the agency, in this case the

---

[3] The ALJ stated that some witnesses referred to the nurses' station and tech station interchangeably.

Commission. *Cintron v. Dart*, 2022 IL App (1st) 201369, ¶ 19. When reviewing an agency's decision to discharge an employee, we must determine (1) whether the agency's factual findings are against the manifest weight of the evidence, and (2) whether the findings of fact provide sufficient basis for the agency's conclusion that cause for discharge exists. *Id.* ¶¶ 19-20.

¶ 33    An agency's factual findings are considered *prima facie* true and correct and only against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50. We will therefore affirm the findings as long as they are supported by evidence in the record. *Rios v. Cook County Sheriff's Merit Board*, 2020 IL App (1st) 191399, ¶ 29. The agency is the judge of the witnesses' credibility, although we may determine "that a witness'[s] testimony has been discredited to a degree that acceptance of that testimony is contrary to the manifest weight of the evidence." (Internal quotation marks omitted.) *Burgess v. Illinois State Board of Education*, 2020 IL App (3d) 170076, ¶ 75. We may not reweigh the evidence or substitute our judgment for the agency's, and will affirm where the issue relates to conflicting testimony and witness credibility. *Beggs*, 2016 IL 120236, ¶ 50; *In re Fatima A.*, 2015 IL App (1st) 133258, ¶ 58. We may not reverse the agency's findings merely because we would have ruled differently or the opposite conclusion is reasonable. *MIFAB, Inc. v. Illinois Human Rights Commission*, 2020 IL App (1st) 181098, ¶ 58.

¶ 34    Here, DHS charged that plaintiff committed conduct unbecoming a state employee by telling Tiu that she was showing him her nipple and that it was "pinkish red." The ALJ found that DHS proved the charge by a preponderance of the evidence and the Commission adopted the ALJ's proposed decision. See 80 Ill. Adm. Code 1.232(a) (1995) (proponent of any matter asserted before

the Commission must establish by a preponderance of the evidence that the matter is more probably true than not).

¶ 35    Plaintiff first argues that the Commission's factual findings were against the manifest weight of the evidence. We disagree.

¶ 36    Tiu testified that, just before 3 p.m. on February 3, 2021, she entered the chart room to deposit her things, exited, got a PPE gown from a cart in the social worker hallway, then realized she had forgotten her keys in the chart room. She asked plaintiff, who was in the social worker hallway near where STAs return their gowns, to unlock the door for her. As he did so, he told her that she was showing her nipples. She asked what he was talking about and he responded, "yeah, I saw it it's pinkish red." Doruelo was in the doctor's office, which can be accessed from the chart room. Doruelo testified that, through glass on the chart room door, she saw Tiu enter the chart room and plaintiff behind her. Tiu looked upset. Thus, the Commission's factual findings have support in the record and are not against the manifest weight of the evidence. See *Rios*, 2020 IL App (1st) 191399, ¶ 29.

¶ 37    Plaintiff disagrees, maintaining that the Commission's findings are against the manifest weight of the evidence despite their support in the record. In support, he cites *Bowlin v. Murphysboro Firefighters Pension Board of Trustees*, 368 Ill. App. 3d 205, 211-12 (2006), where this court stated that "[e]ven when the decision is supported by some evidence, which if undisputed would sustain the administrative finding, it is not sufficient if upon a consideration of all the evidence the finding is against the manifest weight." However, here, unlike in *Bowlin*, the agency's factual findings are not based on one internally inconsistent report which was contradicted by five other reports. *Id.* at 212. Rather, in this case an examination of all the evidence does not discredit

Tiu's and Doruelo's testimony to such a degree that accepting it would be contrary to the manifest weight of the evidence. See *Burgess*, 2020 IL App (3d) 170076, ¶ 75.

¶ 38    Plaintiff argues that Tiu's and Doruelo's testimonies were inconsistent as Tiu testified that Doruelo was inside the chart room and Doruelo testified she was in the doctor's office. The evidence, however, established that the doctor's office is inside the chart room. Doruelo testified she was just in front of the doctor's office door, and Tiu testified that Doruelo was within arm's length of the door when Tiu entered the chart room. Additionally, although plaintiff asserts that as the chart room door opens in front of the doctor's office door it would have obscured Doruelo's view, Doruelo testified the doctor's office door is always open and the chart room door has glass through which she saw plaintiff. We also find the ALJ reasonably concluded that Tiu's handwritten statement that the whole conversation was in Tagalog was an insignificant discrepancy from her testimony that plaintiff said "pinkish red" in English but everything else in Tagalog. See *Woods v. City of Berwyn*, 2014 IL App (1st) 133450, ¶ 37 (minor inconsistencies in testimony do not destroy credibility).

¶ 39    Plaintiff also claims that Doruelo's testimony does not support the Commission's finding because she inconsistently testified about whether she heard plaintiff say the word "red." However, the ALJ correctly noted that even if Doruelo did not hear plaintiff say the word "red" to Tiu, she still clearly testified that she saw plaintiff in the door to the chart room when Tiu entered and that Tiu looked upset, which corroborates Tiu's version of events.

¶ 40    Plaintiff further maintains that it was impossible for him to have been in the social worker hallway and accompany Tiu to the chart room a few minutes before 3 p.m. as, according to his and Simmons's testimony, he was at the tech station waiting to be relieved from 2:55 p.m. to 3 p.m.

Plaintiff and Simmons also testified that STAs could not leave their posts without someone to cover for them, and plaintiff testified that he had no reason to go in the social worker hallway.

¶ 41    However, Simmons testified that STAs entered the social worker hallway several times a day and Tiu testified that STAs have to return their PPE at the end of their shift and could step out to remove their gowns. Thus, although we cannot entirely reconcile the times at which Tiu and Doruelo testified they encountered plaintiff with the time that plaintiff and Simmons testified plaintiff was at the tech station, the record suggests plaintiff could have returned his PPE, encountered Tiu, and then went to the nurse's station after their interaction. Moreover, this question is one of witness credibility and the weight of the evidence, which the Commission was entitled to decide and which we may not reweigh. *Beggs*, 2016 IL 120236, ¶ 50; *Fatima A.*, 2015 IL App (1st) 133258, ¶ 58.

¶ 42    Plaintiff also contends that Tiu was angry at him due to their interaction regarding his overtime form the day prior. However, we cannot say the ALJ was unreasonable in concluding that plaintiff's comment that Tiu should not bring family problems to work would be unlikely to motivate Tiu and Doruelo to lie that plaintiff had sexually harassed her. Accordingly, we affirm the Commission's factual findings.

¶ 43    Next, plaintiff claims that even if the Commission's factual findings were not against the manifest weight of the evidence, they did not provide sufficient basis for the decision that cause existed to discharge him.

¶ 44    Title 80, section 1.170 of the Illinois Administrative Code defines cause as a substantial shortcoming that renders a public employee's continuance in his or her position detrimental to the discipline and efficiency of the service and that law and sound public opinion recognize as good

cause for the employee's removal. 80 Ill. Adm. Code 1.170 (2018). That section further provides that, "[i]n determining the appropriate level of discipline, the Commission shall consider the nature of the offense, the employee's performance record, including disciplinary history, the employee's length of continuous service, and other relevant factors." *Id.*

¶ 45 The agency has considerable discretion in determining what constitutes cause for discharge. *McDermott v. City of Chicago Police Board*, 2016 IL App (1st) 151979, ¶ 34. We afford "substantial deference" to the agency's discharge decision as it is in the best position to determine the effect of the employee's conduct. *Mireles v. Dart*, 2023 IL App (1st) 221090, ¶ 67. We will only overturn the agency's decision if it was "so unreasonable or arbitrary as to be unrelated to the requirements of service." *Id.* Our supreme court has also stated that we are to review a discharge decision under the clearly erroneous standard of review and therefore reverse where "we are left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Beggs*, 2016 IL 120236, ¶ 63.

¶ 46 Plaintiff claims that we should overturn the Commission's decision as there was mitigating evidence under the Code weighing against his discharge. He argues he was employed at DHS for more than 20 years and had a good performance record and insignificant disciplinary history. He acknowledges that in 2007 he was suspended for sexual harassment but notes there were no charges or complaints about sexual harassment between that suspension and the instance at issue here. He further notes that the Bureau did the initial investigation and only recommended discipline and sexual harassment training. He had already served a 30-day suspension pending discharge. Thus, he claims his discharge was not reasonably related to maintaining a safe work environment.

¶ 47    After reviewing the record, we do not find the Commission's decision arbitrary, unreasonable, or unrelated to the requirements of service, nor are we left with the firm conviction that the Commission made a mistake. At the hearing, DHS introduced several employee policies prohibiting sexual harassment and inappropriate behavior, violations of which could result in discharge. The ALJ noted mitigating factors such as the length of plaintiff's service and generally positive performance evaluation, but emphasized that plaintiff's comment to Tiu was inexcusable. Further, the ALJ found that DHS had a responsibility to protect its employees' right to be free from objectification and hostility and to protect itself from liability. The ALJ also found that plaintiff's prior suspension for sexual harassment weighed in favor of discharge. The Commission adopted the ALJ's proposed decision. Thus, the Commission considered plaintiff's performance record, disciplinary history, and length of continuous service, as required. 80 Ill. Adm. Code 1.170 (2018).

¶ 48    Plaintiff further argues that the Commission's decision was unreasonable as it failed to consider a lesser punishment. However, as noted, plaintiff had already served a 30-day suspension for sexual harassment. We disagree with plaintiff that the fact that incident occurred in 2007 should lessen its weight towards discharge. Rather, it shows that the prior suspension did not prevent plaintiff from making an inappropriate comment to a coworker. It was therefore not unreasonable for the Commission to conclude that discharging plaintiff was warranted.

¶ 49    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County upholding the Commission's decision.

¶ 50    Affirmed.